IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 23-cv-1051

**CAITLIN RAYMOND,**

    Plaintiff,

v.

**JULIE PRUTSMAN, an individual,
PATRICK PRUTSMAN, an individual,
SHERI JACKSON-KAISER, an individual,
JASON KAISER, an individual, and
COLIN CUNDIFF, an individual,**

    Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff, Caitlin Raymond, by and through their counsel of record, BAUMGARTNER LAW, LLC, respectfully submit this Complaint against the Defendants, and allege and aver as follows:

**JURISDICTION AND VENUE**

1. The causes of action in this Complaint and Jury Demand are brought pursuant to Colorado's Premises Liability Statute, C.R.S. §13-21-115 *et seq*., and Colorado common law.

2. Jurisdiction is founded upon complete diversity of the parties, pursuant to 28 U.S.C §1332. The amount in controversy exceeds $75,000.00.

3. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events,

acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

4. Plaintiff, Caitlan Raymond is citizen of the State of California, residing and domiciled in California.

5. Defendant Julie Prutsman is an individual landowner, pursuant to the Colorado Premises Liability Act who was at all times relevant to this Complaint was a citizen of the State of Colorado and was domiciled in the State of Colorado.

6. Defendant Patrick Prutsman is an individual landowner, pursuant to the Colorado Premises Liability Act who was at all times relevant to this Complaint was a citizen of the State of Colorado and was domiciled in the State of Colorado.

7. Defendant Sheri Jackson-Kaiser is an individual who was at all times relevant to this Complaint was a citizen of the State of Colorado and was domiciled in the State of Colorado.

8. Defendant Jason Kaiser is an individual who was at all times relevant to this Complaint was a citizen of the State of Colorado and was domiciled in the State of Colorado.

9. Defendant Collin Cundiff is an individual who was at all times relevant to this Complaint was a citizen of the State of Colorado and was domiciled in the State of Colorado.

10. All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

11. On March 18, 2020, Colorado Governor Jared Polis announced that all Colorado schools must suspend in-person instruction.

12.     On April 3, 2020, the Douglas County School District announced that all schools in the district would remain closed for in-person learning for the remainder of the school year. This included Mountain Vista High School.

13.     The following school year, the students went to in-person school about half the time and conducted remote learning about half the time.

14.     By May of 2021, the students in the Douglas County School District remained substantially isolated from each other and the community because of the pandemic, and their social outlets were severely restricted.

15.     At the time, Plaintiff was a senior at Mountain Vista High School, as was Defendant Cundiff.

16.     Defendants Julie and Patrick Prutsman (hereafter together referred to as "the Prutsmans") have a son who was a sophomore at Mountain Vista at the time.

17.     Shari Jackson-Kaiser and Jason Kaiser (hereafter referred to as "the Kaisers") have a daughter who was a junior at Mountain Vista at the time.

18.     As part of the "lockdown" the Mountain Vista High School prom was severely curtailed. The students were allowed to attend a school-sponsored event, but only for thirty minutes each, wearing masks, and with limited opportunity for socializing. In practical terms this meant that the students were able to show up for the event, have their photographs taken and then were out of time.

19.     The Prutsmans and the Kaisers decided that they would like to provide the students with an event that more resembled a traditional prom dance. They decided to throw a Hawaiian themed prom event on May 8, 2021 at the Prutsmans' home in Douglas County.

20. The party venue consisted of a barn area, where the party would mostly take place and then the main house.

21. When organizing the event, the Prutsmans and the Kaisers developed a "guest list" that they intended to enforce.

22. The only way for a teenager to be included on the list was for the Kaisers or the Prutsmans to add them to the list.

23. The Kaisers and the Prutsmans represented to the invited guests that they would be enforcing the guest list, and that they would be supervising the event.

24. In addition to enforcing a guest list for attendance, the Kaisers and the Prutsmans intended that a small group of minors would stay the night at the Prutsmans' house.

25. The Prutsmans and the Kaisers knew that the teenagers had been isolated and that teenagers were difficult to supervise under normal circumstances.

26. The Prutsmans would later say that they decided to enforce the guest list and supervise the teenagers because they didn't want any of the "wrong" kids staying at the house.

27. In fact, the Prutsmans would later tell law enforcement that they had decided to carefully supervise the teenagers – to be "uber cautious" - because "you can't control kids."

28. Furthermore, the Prutsmans and the Kaisers represented to the attendees that they would be chaperoning the party and monitoring the teenagers.

29. In fact, Plaintiff's mother told her that she did not believe it was a good idea to stay the night at the house, but Plaintiff assured her mother that both the Prutsmans and the Kaisers were enforcing a guest list and that they would be supervising the teenagers.

30. Both the Prutsmans and the Kaisers determined to only allow between 25-50 teenagers to

attend the party, because they considered this to be a manageable number of teenagers at the residence, and that they could adequately supervise a group of this size. They described the intended event as "small and controlled."

31. When Plaintiff arrived at the Prutsmans' home, both Mrs. Prutsman and Mrs. Jackson-Kaiser were sitting at a white table at the entrance, making sure that the teenagers were on the guest list, and taking car keys to ensure that none of the teenagers drove away from the party intoxicated. The table very much resembled the sort of check-in that a high school student would expect to encounter at an official school prom.

32. Although Mr. and Mr. Kaiser were not seated at the check-in table with their wives, they were very much present and initially supervising the invitees.

33. In performing these supervisory roles, all four adult defendants were assuming the role that chaperones at a school dance would normally perform.

34. However, as the night progressed, both the Prutsmans and the Kaisers abandoned their plan to control the guest list, and eventually simply allowed any teenager that showed up to come onto their premises.

35. By the end of the night, neither the Prutsmans nor the Kaisers had any idea how many teenagers were at the party. Although they could not tell how many teenagers they actually allowed onto their property, they would later tell investigators that they checked off every name on the original guest list.

36. Upon information and belief, the number of teenagers that the Prutsmans and the Kaisers allowed onto the property exceeded 100 at one time. No matter the exact number of teenagers, the Prutsmans and the Kaisers allowed so many of them to attend the party that it was simply not

possible to provide any meaningful supervision of the minors.

37. Predictably, as the enforcement of the guest list waned, so did the adults' general supervision of the teenagers, despite the fact that the Prutsmans and the Kaisers had already recognized and discussed the danger of having a large group of teenagers on the property.

38. The lack of supervision was due in part to the decision to allow an unrestricted number of teenagers into the party, and in part due to the Prutsmans and the Kaisers simply not wanting to do the work of supervising the teenagers.

39. At 11:00 p.m., the Kaisers and the Prutsmans decided to end the party and began telling the teenagers to go home.

40. However, none of the adults enforced their directions to leave the premises, and many of the teenagers moved from the barn to the house, where they continued to conduct themselves without any adult supervision well into the early morning hours.

41. Sometime after 11:00 p.m., and while at the residence, one of the teenagers told Sheri Jackson-Kaiser and Julie Prutsman that a teenager had vomited in one of the rooms. As Mrs. Prutsman and Mrs. Kaiser were cleaning up the vomit, another teenager told them that two of the minors were in a closet by themselves.

42. Julie Prutsman immediately said, "not happening." There will be no sex in this house." Mrs. Prutsman made the teenagers exit the closet.

43. However, neither Mrs. Prutsman nor Mrs. Kaiser took any steps to ensure that the teenagers were supervised thereafter, and Mrs. Prutsman simply went to bed while an unknown number of teenagers continued to socialize in the Prutsman home.

44. Mr. Prutsman also decided to go to sleep, despite knowing that many teenagers were

unsupervised in his home.

45. Plaintiff and Collin Cundiff were among the many unsupervised teenagers who were left in the house in the early morning hours.

46. Mr. Cundiff and Plaintiff went into a closet where they began "making out."

47. Plaintiff intended to simply make out with Mr. Cundiff and did not intend to have sex with him.

48. However, the encounter between Plaintiff and Mr. Cundiff escalated quickly, and Mr. Cundiff began to do more than just "make out" with Plaintiff.

49. Mr. Cundiff put his hands on Plaintiff's breasts and vagina, and Plaintiff pushed his hands away, telling him to stop.

50. However, Mr. Cundiff did not stop. Mr. Cundiff continued to grope and kiss Plaintiff, and removed Plaintiff's clothing.

51. Mr. Cundiff penetrated Plaintiff's vagina with his penis and did in fact have sexual intercourse with Plaintiff.

52. Plaintiff did not consent to sexual intercourse.

53. It is unknown whether Mr. Cundiff was aware that Plaintiff did not consent to sexual intercourse.

54. After Plaintiff and Mr. Cundiff were in the closet a short time, Plaintiff's good friend decided to check on Plaintiff because he was concerned about her being alone in a closed room with Mr. Cundiff.

55. When Plaintiff's friend knocked on the door, he heard noises that concerned him, and he tried to open the door, which did not have a lock on it.

56. However, when Mr. Cundiff noticed the door opening, he wedged his foot between the bottom of the door and the floor to prevent it from opening.

57. Plaintiff's friend struggled to open the door, but could not overpower Mr. Cundiff.

58. The other teenagers in the house were aware that this was happening, and could hear the commotion.

59. When Plaintiff came out of the closet a short time after, she was distraught, and her friend immediately began to care for her.

60. None of the adults who had undertaken to supervise the event were present.

61. Plaintiff's friend noticed that she was bleeding heavily from her vagina, even though she was now fully clothed.

62. Mr. Cundiff had a reputation among the teenagers for being very aggressive with female teenagers.

63. Upon information and belief, Mr. Cundiff was not on the guest list, and was one of the teenagers that the Prutsmans and the Kaisers would not have allowed onto the premises had they enforced the guest list, or if they had maintained their decision to supervise the teens.

64. Had the Kaisers and/or the Prutsmans reasonably enforced the guest list or reasonably supervised the event they themselves conceived, organized, and executed, the incident between Plaintiff and Mr. Cundiff would not have occurred. In fact, the Kaisers and the Prutsmans were aware that other teenagers were having or attempting to have sex in the home, and Julie Prutsman appears to have supervised and stopped this activity earlier in the night.

65. In the following days, Mr. Cundiff sent Plaintiff a message on social media which said, "I'm sorry for what I did. I should have known better."

66. The Douglas County Sheriff's Office investigated the incident, but was unable to determine any criminal liability for Mr. Cundiff.

67. The detective did, however, conduct interviews of the Prutsmans and the Kaisers.

68. During those interviews, both the Kaisers and the Prutsmans acknowledged the importance of controlling access to the party and supervising the teenagers.

69. Neither the Prutsmans nor the Kaisers offered any explanation for the failure to enforce the guest list or for their failure to supervise the teenagers.

70. The Prutsmans and the Kaisers knew that inviting 100 teenagers onto their property created a danger to anyone on the property. It is for that reason that they were initially "uber cautious" and had decided to enforce a "small and manageable" number of attendees.

71. The Prutsmans and the Kaisers held out to the invitees, including Plaintiff, that they would be supervising the teenagers on the property.

72. Despite recognizing the danger that large numbers of teenagers posed, and assuring everyone that they would provide supervision, the Prutsmans and the Kaisers simply abandoned their obligations.

73. They opened the premises up to any person in the world without restriction, and well into the early morning hours, and left many teenagers without any supervision whatsoever, despite knowing that they were engaged in dangerous activities.

74. As stated above, both the Kaisers and the Prutsmans knew specifically that the teenagers were engaged in dangerous activities, including sexual activities.

75. However, the Kaisers left the premises at some point after acquiring this specific knowledge, and made no effort whatsoever to protect the teenagers.

76. As stated above, the Prutsmans abandoned all responsibilities that had taken on and even in the face of very specific information that dangerous activities were taking place, simple decided to go to sleep and hope for the best.

77. Had either the Prutsmans or the Kaisers observed their duty to enforce the guest list as promised, or reasonably supervise the teenagers, as promised, Plaintiff would not have been subjected to non-consensual sexual intercourse.

## CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF
Premises Liability Pursuant to C.R.S. 13-21-115
(*Against Defendant Julie and Patrick Prutsman*)

78. Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

79. As a social guest, Plaintiff was a licensee on the Prutsman's property.

80. The Prutsmans had a duty to all of the social guests, particularly given their age, and maturity, to exercise reasonable care with respect to dangers created by allowing large numbers of teenagers on their property, which they admitted to being aware of.

81. The Prutsmans also had a duty to warn their social guests, particularly given their age and maturity, about dangers they knew about that are not ordinarily present on residential property, even if the Prutsmans did not create the dangers. Specifically, the Prutsmans had a duty to warn the teenagers on their property that they were not enforcing the guest list, that there were uninvited guests at the party, and that they were not supervising any of the teenagers on the property.

82. As a result of the Prutsmans' failure to exercise reasonable care with respect to the danger they created on their property, and which they were aware of, Plaintiff suffered injuries and

damages.

83. As a result of the Prutsmans' failure to warn Plaintiff about the dangers not ordinarily on a residential property, namely, large numbers of unsupervised and unknown teenagers, Plaintiff suffered injuries and damages.

SECOND CLAIM FOR RELIEF
Negligent Performance of Undertaking to Render Services
(*Against Defendants Sheri Jackson-Kaiser and Jason Kaiser*)

84. Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

85. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

    a. his failure to exercise such care increases the risk of such harm, or

    b. the harm is suffered because of the other's reliance upon the undertaking.

*Jefferson Cnty. Sch. Dist. R-1 v. Justus By & Through Justus*, 725 P.2d 767, 770 (Colo. 1986)

86. Here, the Kaisers recognized the danger of having a large mass of teenagers on the property for the type of event they organized, and undertook by words and actions represented and took actions demonstrating that they assumed a duty of care toward the invitees, including Plaintiff.

87. The Kaisers voluntarily undertook (1) to enforce the guest list and (2) to supervise the teenagers at the event, because they recognized that these services were necessary for the protection of the guests such as Plaintiff.

88. Plaintiff did in fact rely on the Kaisers' undertakings, and even assured her mother that she

would be safe staying overnight due to the Kaisers' voluntary undertakings.

89. As a result of the Kaisers' failure to reasonably perform their undertakings, Plaintiff suffered injuries and damages.

THIRD CLAIM FOR RELIEF
Negligence
(*Against Defendant Collin Cundiff*)

90. Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

91. Defendant Cundiff had a duty to exercise reasonable care in his physical and intimate interaction with Plaintiff, including a duty to reasonably ascertain her consent as to engaging in sexual intercourse.

92. Defendant Cundiff failed to exercise reasonable care toward Plaintiff and as a result Plaintiff suffered injuries and damages.

93. As a result of Defendant Cundiff's failure to exercise reasonable care, Plaintiff suffered injuries and damages.

**DAMAGES**

94. As a result of the actions and omissions of all Defendants, Plaintiff has suffered past and future injuries and damages, including but not limited to economic losses, severe emotional distress, great physical and emotional pain, embarrassment and humiliation, loss of reputation, and other damages.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, Caitlin Raymond, respectfully requests that this Court enter judgment in his favor and against the Defendants as follows:

a. General and compensatory damages in an amount that will fully and fairly compensate Plaintiff for her injuries, damages, losses.

c. Pre- and post-judgment interest.

d. Reasonable attorneys' fees, expert witness fees, and the cost of this action, as the Court deems appropriate.

e. Any other relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 25th day of April, 2023.

BAUMGARTNER LAW, L.L.C.

s/ S. Birk Baumgartner
S. Birk Baumgartner
730 17th St., Ste. 340
Denver, CO 80202
Phone: (303) 529-3476
Fax: (720) 634-1018
birk@baumgartnerlaw.com
sean@baumgartnerlaw.com
*Counsel for Plaintiff*

Plaintiff's Addresses:
c/o Baumgartner Law, LLC
730 17th St., Ste. 340
Denver, CO 80202